**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **12 CR 603-1** |
| | ) | |
| **LAMONT COLBERT** | ) | **Judge John Z. Lee** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

On March 7, 2012, Defendant Lamont Colbert, a convicted felon, was arrested for possessing a firearm in violation of 18 U.S.C. § 922(g).  He moved to quash the arrest and to suppress the gun and a statement he made to police, arguing that the police lacked reasonable suspicion to stop and detain him and, consequently, the gun that he threw onto the sidewalk while he was being detained and that formed the basis of his arrest was the product of an unlawful seizure and his statement was derivative of an illegality.  The Court denied his motion, finding that the police had reasonable suspicion.  Now, Colbert has filed a second motion seeking the same relief.

In his second motion, Colbert argues that, in an interview that took place after the Court had ruled on the first motion, one of the two arresting officers stated that he grabbed Colbert before Colbert threw the gun onto the sidewalk.  According to Colbert, this differed from the officer's initial account of the incident in which the officer had not mentioned this physical contact with Colbert.  The Court conducted an evidentiary hearing at which both arresting officers testified.  For the reasons stated herein, Defendant's second motion to quash arrest and suppress evidence is denied.

**<u>Facts</u>**

On March 7, 2012, at approximately 10:45 p.m., Chicago Police Department Officers Ludwig and Gentile were on patrol near the intersection of East Marquette Road ("E. Marquette") and South Maryland Avenue ("S. Maryland") in Chicago, Illinois. (4/9/13 Evidentiary Hr'g Tr. ("Tr.") 6-7.) The officers knew that a homicide had taken place approximately one block away the day before. (*Id.* 41.)

As the officers were driving in their patrol car westbound on E. Marquette Road, they saw a man near the corner on S. Maryland Avenue. (*Id.* 8-9.) The man was initially looking west, then, as the officers approached, he looked east towards the officers. (*Id.* 50.) The man then turned south and yelled and made motions to an individual (later identified as Defendant) on the other end of the block. (*Id.* 50, 53) The officers believed the man was serving as a lookout. (*Id.*)

The officers then observed Defendant running onto the porch of a residence at 6604 S. Maryland Avenue. (*Id.* 9, 12, 53.) Detective Ludwig, who was driving the patrol car, turned the car southbound on Maryland Avenue and observed Defendant run approximately seven to nine feet to the porch. (*Id.* 9, 22) Ludwig then pulled the car up in front of the residence. (*Id.* 12.) Officer Gentile, the passenger in the patrol car, watched Defendant run from the street curb, over some grass, onto the porch. (*Id.* 53.) Gentile estimated that Defendant ran "10, 15 feet," at a "fast" pace. (*Id.* 54-55, 75.) Although other people were in the area, Gentile observed only Defendant running. (*Id.* 75.)

Gentile exited the vehicle first and approached the porch to speak with Defendant about the homicide that had occurred the day before and to investigate whether Defendant had a weapon or contraband. (*Id.* 12-13, 40-41, 56, 74.) Ludwig put the car in park, waited to see if

Defendant was going to flee from the porch, and then, upon determining that Defendant was going to remain on the porch, exited the car and approached the porch. (*Id.* 13.)

As Gentile approached, Defendant was sitting on the porch with his hands hidden; his left hand was in his pocket and his right hand was not visible. (*Id.* 56-57.) Initially, Gentile held his firearm in the ready position, pointed downwards, but when he noticed that Ludwig had exited the car and was near him, Gentile re-holstered his weapon. (*Id.* 61-64.) As the officers approached, they asked Defendant three to four times to show them his hands, but he refused. (*Id.* 13-15, 56-57.) The officers wanted to see his hands because they were concerned for their own safety and thought he might have had a weapon. (*Id.* 40, 56, 74.)

When Gentile reached the porch, he approached Defendant's left side and tried to feel the outer garment area where Defendant had his left hand, but Defendant "tensed up" and would not give Gentile his left hand. (*Id.* 63-64.) Gentile tried to search Defendant's right side from behind, but Defendant moved back and forth, and moved his body down, preventing Gentile from feeling Defendant's right side. (*Id.* 64.) Gentile also tried to restrain Defendant's left hand behind his back. (*Id.*) As Gentile was trying to get Defendant's left hand out of his pocket, Defendant reached and grabbed a railing with his right hand. (*Id.* 14-15.)

Because Defendant was not complying with the officers' commands, Ludwig grabbed Defendant's right arm, but Defendant pulled his arm back, causing Ludwig to fall forward a step or two. (*Id.*) After Ludwig fell, he saw something go over his head. (*Id.* 15.) He looked behind him and saw a gun land on the sidewalk. (*Id.* 15-16) He could hear it land, and he immediately went down to the sidewalk and recovered it. (*Id.* 16.)

From his angle, Gentile could see Defendant with the gun in his right hand as he was throwing it forward. (*Id.* 66.) Gentile did not see where it landed, but he heard it hit the ground.

(*Id.*)  When the gun hit the ground, Gentile heard other people in the area, who had gathered on the sidewalk in front of the porch, say "oh, wow" and back away from the gun.  (*Id.* 16, 66-67.)

Defendant was placed into custody and taken for processing.  (Chicago Police Department Original Case Incident Report.)  After he was advised of his *Miranda* rights, Defendant told police, "I have the gun because my little brother got killed yesterday."  (*Id.*)  Defendant now moves, for the second time, to quash his arrest and suppress the gun and his statement, arguing that Officers Ludwig and Gentile lacked reasonable suspicion to stop and investigate him, and that the encounter constituted an arrest requiring probable cause.

<u>Discussion</u>

**A.**     **Reasonable Suspicion**

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Ker v. Cal.*, 374 U.S. 23, 30 (1963), provides that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . ."  U.S. Const. amend. IV.  Pursuant to the Supreme Court's decision in *Terry v. Ohio*, police can stop and detain an individual for investigative purposes without violating the Fourth Amendment if police have a "reasonable suspicion" supported by articulable facts that criminal activity is afoot.  392 U.S. 1, 21-22 (1968).  Although "reasonable suspicion" is a less demanding standard than probable cause and requires a showing less than preponderance of the evidence, the Fourth Amendment still requires at least a minimal level of objective justification for making the stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  "In other words, reasonable suspicion is less than probable cause but more than a hunch."  *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

In forming reasonable suspicion, "[p]olice officers are entitled to rely on their experience and training." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). Determining whether an officer had reasonable suspicion is assessed in light of the totality of the circumstances known to the officer and "common-sensical judgments and inferences about human behavior." *Id.* (quoting *Ill. v. Wardlow*, 528 U.S. 119, 125 (2000)); *Lawshea*, 461 F.3d at 859. Relevant considerations include the time and place of a stop, and the behavior of the individual stopped. A late hour or the high-crime nature of an area can contribute to reasonable suspicion. *See Wardlow*, 528 U.S. at 124 ("the fact that the stop occurred in a "high crime area" [is] among the relevant contextual considerations in a *Terry* analysis."); *Lawshea*, 461 F.3d at 859 ("[Defendant's] flight from [the police officer] in a high-crime area just before midnight gave the officer a reasonable suspicion to stop [Defendant].") Evasive behavior, including unprovoked flight, is also a "pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124-25 (reasonable suspicion existed to stop an individual who fled upon seeing officers patrolling an area known for heavy drug trafficking); *Lawshea*, 461 F.3d at 859 ("Since *Wardlow*, we have made it clear that when a suspect attempts to flee from the police, the officers have reasonable suspicion to pursue the suspect in order to conduct a *Terry* stop."); *Lenoir*, 318 F.3d at 729 ("a person's flight upon seeing the police approach in a high crime area establishes reasonable suspicion to justify a *Terry* stop.").

Moreover, although running from the police is "the consummate act of evasion," *see Wardlow*, 528 U.S. 119 at 124, courts regularly find evasive behavior short of headlong flight sufficient to warrant a *Terry* stop. *See, e.g.*, *Oglesby*, 597 F.3d at 894 (finding defendant's actions in slowly taking a few steps away from a group while looking from side to side and

angling his body away from the police officers were pertinent factors in determining reasonable suspicion); *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) (holding that the officer had reasonable suspicion to conduct a *Terry* stop and concluding that "[i]t was also reasonable for [the officer] to interpret the [defendant's] vehicle's sudden acceleration as evidence of unprovoked flight"); *United States v. Mays*, 643 F.3d 537 (6th Cir. 2011) ("flight is not the only type of 'nervous evasive behavior.' Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions.") (internal citations omitted); *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (noting that courts can consider "evasive conduct that falls short of headlong flight" and holding that defendant's "evasive conduct" included "immediately walk[ing] away as the officers approached, and although [defendant] did not run, he walked away at a quick pace, ignoring the officer's commands to stop.") Indeed, "certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." *Lawshea*, 461 F.3d at 859.

Here, Officers Ludwig and Gentile had reasonable suspicion to stop and detain Defendant. At the time of the incident, the officers were on patrol at approximately 10:45 p.m. in a high-crime area, just one block from where a homicide by firearm had occurred the previous day.[1] (Tr. 6-7, 41.) Additionally, Defendant exhibited evasive behavior. Ludwig and Gentile

---

[1] In his second motion, Defendant contends that there is no reasonable basis to conclude that Officers Ludwig and Gentile were in a "high-crime" area because they had never been assigned to patrol that district. As an initial matter, Defendant requested leave to file a second motion based upon the discovery of new evidence relating to the officers' physical contact with Defendant on the porch, not to challenge the Court's conclusion that the incident occurred in a "high crime" area. For this reason, the Court granted an evidentiary hearing for the limited purpose "to determine and hear from the officers as to what exactly happened on the porch." Nevertheless, at the evidentiary hearing, Defense counsel asked Ludwig whether he was "familiar with that area." (Tr. 22.) Ludwig replied that he was not and stated that it was his "first night working in [that] district, so I really didn't know that district very well." (*Id.*) Defendant contends that this response precludes the officers from

saw the man on the corner look toward them, turn toward Defendant, and yell and motion toward Defendant. (*Id.* 9, 12, 53.) They then observed Defendant running. (*Id.*) Although other people were in the area, the officers saw only Defendant running. (*Id.* 75.) Furthermore, to the officers, the man standing on the corner appeared to be a lookout for Defendant, warning Defendant of the officers' presence by first seeing the officers and then turning toward and yelling in the direction of Defendant, at which time the officers spotted Defendant running. (*Id.* 50, 53.) Defendant's behavior, considered in light of the surrounding circumstances, including the late hour and the shooting one block away the previous day, provided reasonable suspicion for the officers to stop and investigate Defendant. *See Lawshea*, 461 F.3d at 859; *Lenoir*, 318 F.3d at 729.[2]

## B. Degree of Intrusion

Defendant argues, however, that when Gentile and Ludwig approached him on the porch, the encounter was an arrest requiring probable cause, not just a *Terry* stop requiring only reasonable suspicion, especially in light of the new evidence that the officers physically grabbed him on the porch. The Court disagrees. Before Defendant threw the gun onto the ground, the encounter did not escalate from a *Terry* stop into an arrest. When he threw the gun, the officers' reasonable suspicion ripened into probable cause to make an arrest. *See United States v.*

concluding that the area was a "high-crime" area. But patrolling an area is not a prerequisite to knowing that the area is a "high-crime" area. In any event, the officers' knowledge that a homicide had occurred the day before only a block away reasonably contributed to their suspicion.

[2] In his second motion, Defendant argues, as he did in his first motion, that he did not "flee" from the officers because he simply ran onto the porch and sat down. Nothing from the evidentiary hearing, however, provides the Court with a basis to question its finding that Defendant's evasive behavior contributed to the officers' reasonable suspicion. The two officers testified that, after they saw the man on the corner look at them, turn toward Defendant, and yell and motion toward Defendant, they saw Defendant running. The Court finds their testimony credible. As discussed, evasive behavior can contribute to reasonable suspicion, even if the behavior falls short of headlong flight stopped only by physical force from the police. Thus, although Defendant ran to the porch and no further, his evasive behavior contributed to the officers' reasonable suspicion.

*Williams*, 333 Fed. App'x. 127, 128 (7th Cir. 2009) ("once the officers saw the gun thrown, they had probable cause to make an arrest") (citing *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000)).[3]

"There is no bright-line that separates a *Terry* investigatory stop from a formal arrest." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). "The distinction hinges on the intrusiveness of the detention, which is a 'flexible and highly fact-intensive' inquiry." *Id.* (quoting *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004)). For a stop to remain a *Terry* stop and not rise to an arrest, the officers' actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The Court must bear in mind that "an investigatory stop can involve a measured use of force." *Jewett*, 521 F.3d at 824. Indeed, the Seventh Circuit has noted explicitly that "a necessary corollary to the power of the police to conduct an investigatory stop is the ability to use reasonable means to effectuate that stop." *Id.* (quotations omitted); *see Graham v. Connor*, 490 U.S. 386, 396 (1989); *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) ("It is well-established that '[a] measured use of force . . . appropriate to accomplish the purpose of [the] investigatory stop' does not convert a *Terry* stop into an arrest." (quoting *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir. 1992)). But an officer's use of force may escalate to the point where the encounter becomes, as a matter of law, a formal arrest. *See Weaver*, 8 F.3d at 1244.

In differentiating between a *Terry* stop and an arrest, "the touchstone is reasonableness: Were the officer's actions reasonable in light of all the circumstances?" *Jewett*, 521 F.3d at 824 (citing *Graham*, 490 U.S. at 396). In evaluating whether the force that an officer used to effectuate the investigatory stop was so disproportionate to the purpose of the stop as to convert

---

[3] Defendant does not challenge whether the officers had probable cause to arrest him after the officers observed him throw the gun.

the encounter to a full arrest, the Court considers whether "the surrounding circumstances g[a]ve rise to a justifiable fear for personal safety" on the part of the officer. *United States v. Timon*, 19 F.3d 1221, 1226 (7th Cir. 1994). The Court must also consider "the defendant's own action in resisting an officer's efforts." *Lawshea*, 461 F.3d at 860; *see also Weaver*, 8 F.3d at 1244 (noting that a "suspect cannot complain that [a] police officer took forcible steps to detain him when the suspect's own actions created the need for those steps") (citing *Tom*, 963 F.2d at 958-59 & n.6). Given the potential dangers involved in conducting investigatory stops, "*Terry* allows an officer to conduct a pat-down search if the officer has articulable facts that led him or her to believe that the individual could be armed or present a threat to others." *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003); *see Terry*, 392 U.S. at 27. Indeed, "[t]o require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry*." *Stewart*, 388 F.3d at 1085 (internal quotation marks and citation omitted).

Here, Gentile and Ludwig's detention of Defendant prior to Defendant's throwing of the gun did not exceed the permissible bounds of an investigatory detention under *Terry* because the measures the officers employed were reasonable when evaluated under the totality of the circumstances. Gentile and Ludwig were on patrol late at night just one block from where a homicide had taken place the day before. When they saw the man, whom they believed served as a lookout, warn Defendant of their presence and then observed Defendant running from their direction, the circumstances gave rise to a justifiable concern for the officers' personal safety. This concern heightened when Gentile got out of the patrol car and approached Defendant on foot because Gentile could not see Defendant's hands and Defendant refused multiple requests to show them. (Tr. 40, 56, 74.) Given these circumstances, Gentile's act of taking his gun out of its holster, pointed down, was not unreasonable. *See United States v. Lechuga*, 925 F.2d 1035,

1040 (7th Cir. 1991) (collecting "numerous cases allowing the use of drawn weapons" during *Terry* stops without transforming the encounters into arrests); *United States v. Serna-Barreto*, 842 F.2d 965, 960 (7th Cir. 1988). Moreover, when Gentile was assured that Ludwig was also out of the car and near him, he re-holstered his gun before he reached the porch where Defendant was sitting, further suggesting that he had acted due to personal safety concerns. (Tr. 61, 63-64.)

Additionally, the officers' physical contact with Defendant on the porch was reasonable in light of the circumstances. To protect themselves and others, Gentile approached Defendant's left side and tried to feel the outer garment area where Defendant had his left hand, as officers in *Terry* stops are permitted to do. *See Terry*, 392 U.S. at 26 (officers can search as "necessary for the discovery of weapons which might be used to harm the officer or others nearby"); *Hernandez-Rivas*, 348 F.3d at 599. But according to the officers' testimony, which the Court finds credible, Defendant "tensed up" and would not give Gentile his left hand. (Tr. 63.) When Gentile tried to search Defendant's right side from behind, Defendant moved back and forth and moved his body down, preventing Gentile from searching for weapons. (*Id.* 63-64.) This resistance made it necessary for Ludwig to grab Defendant's right arm when Defendant removed his right hand from his pocket and reached for and grabbed a railing. (*Id.* 14-15.) Trying to restrain the free arm of an individual already struggling with police is reasonable, especially when police suspect the individual is armed. *See Lawshea*, 461 F.3d at 860; *Jewett*, 521 F.3d at 826-27. Immediately after Ludwig grabbed Defendant's right arm, Defendant pulled his arm back and threw the gun over Ludwig's head onto the sidewalk, giving the officers probable cause to make an arrest. (*Id.* 14-15.); *Williams*, 333 Fed. App'x. at 128. Thus, the measures the officers employed to effectuate the *Terry* stop were reasonable when evaluated under the totality

of the circumstances, and once Defendant threw the gun, the officers had probable cause to arrest him.

In sum, the totality of the circumstances provided the officers with a reasonable suspicion to stop and detain Defendant and to effectuate that stop using reasonable means, which they did. Therefore, Defendant's arrest and the government's seizure were predicated upon a lawful seizure, and the post-*Miranda* statement made by Defendant after his arrest was not derived from illegality.

### Conclusion

For the reasons herein, the Court denies Defendant's second motion to quash arrest and suppress certain evidence [55].


**SO ORDERED**                          **ENTER: 6/10/13**

 

_____
**JOHN Z. LEE**
**U.S. District Judge**